IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

SIDNEY L. COLEMAN,

                             Plaintiff,                      OPINION AND ORDER

    v.

                                             21-cv-65-wmc

SAM SPERRY,

                           Defendant.

A jury found in favor of *pro se* plaintiff Sidney L. Coleman on Fourth Amendment unlawful seizure and malicious prosecution claims asserted against defendant Sam Sperry, an Eau Claire Police Department officer, and in Officer Sperry's favor on Coleman's Fourth Amendment excessive force clam. (Dkt. #148.) The jury proceeded to award Coleman compensatory and punitive damages totaling $550,000. (Dkt. #149.) The court then entered final judgment accordingly. (Dkt. # 151.)

Still pending before the court are seven, post-judgment motions. In two of those motions, defendant moves for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and for a new trial under Rule 59. (Dkt. ##161, 162.) Those motions will be denied in their entirety because the court finds that the jury's verdict is supported by the evidence. In a third motion, which the court will grant in part, defendant asks the court to stay plaintiff's execution on the final judgment and waive any requirement for a supersedeas bond pending final resolution of the case. (Dkt. #166.) In the fourth motion, plaintiff asks the court to appoint him counsel. That motion, along with what are essentially cross-motions for a new trial on his excessive force claim in plaintiff's responses to defendant's motions (dkt. ##174 at 2 & 176 at 2), will all be denied, although counsel

is likely to be appointed by the Seventh Circuit in inevitable appeals by both sides. Finally, the court will deny plaintiff's motion for prejudgment interest. (Dkt. #186.)

## BACKGROUND

On January 28, 2021, Sidney Coleman filed a complaint against the Eau Claire Police Department, the City of Eau Claire, the State of Wisconsin, and various Eau Claire Police Department officers, county prosecutors, and state court judges, claiming that on October 7, 2019, he was illegally stopped, searched, and prosecuted after being racially profiled as a drug dealer.[1] (Dkt. #1.) Coleman was granted leave to proceed against Officer Sperry, Eau Claire Police Department Officer Jimmy Vang, and four John Doe defendants on Fourth Amendment claims based on the stop and search of his vehicle, the search of his hotel room, and for malicious prosecution, as well as a Fourth Amendment excessive force claim based on gun pointing.[2] (Dkt. #13.) With the limited factual record before it, the court granted summary judgment on Coleman's claims in favor of every defendant save Sperry, and his remaining claims against Sperry proceeded to trial.[3] (Dkt. #72.)

---

[1] Coleman's complaint initially included his brother Timothy Coleman and wife Lakesha Johnson as named plaintiffs. However, both Timothy and Lakesha were dismissed from this case for failure to prosecute. (Dkt. #11 and Dkt. #12.)

[2] The John Doe defendants were subsequently identified as Eau Claire Police Department Officers Cole Conway, Anthony Briski, David Mikunda, and Aaron Schiefelbein.

[3] Through summary judgment, neither party had taken *any* depositions. After the close of discovery and shortly before the court issued its opinion granting and denying in part defendants' motion for summary judgment, however, defendants moved to compel Coleman's deposition. (Dkt. #60.) Two weeks earlier, defendants had previously sent Coleman a notice requiring his deposition on March 5, 2024, three days before the close of discovery. (Dkt. #62-1.) Though Coleman claimed he never received that notice, defendants produced evidence suggesting that Coleman had, in fact,

At trial, Coleman testified to his version of his relevant interactions with Officer Sperry. In short, Coleman had moved to a motel in Eau Claire from Alabama with his wife and children, seeking a fresh start in life. (Dkt. #153, at 99:23-100:5.) On the evening of October 7, 2019, Coleman and his brother Timothy, who was visiting, left the motel because Timothy needed to go to the store. (*Id.* 100:14-19.) Before setting off on that errand in Timothy's rental car, Coleman briefly went back upstairs to retrieve his driver's license from his room. (*Id.* 100:20-101:1, 107:18-22.) Despite complying with all traffic laws, Coleman was nevertheless pulled over by a police car. (*Id.* 106:9-107:8.) Concerned about their safety inside of the vehicle, both Colemans then got out of their car and locked the doors at Timothy's instigation. (*Id.* 107:2-108:3.) At that point, the Eau Claire Police Department officer who had pulled them over -- later identified as Officer Sperry -- pulled his gun on them, before other officers arrived and did the same. (*Id.* 108:9-14.) Coleman and his brother were then handcuffed and taken to a squad car. (*Id.* 108:23-109:3.)

While the Colemans were in the squad car, Sperry and his colleagues searched the rental car. (*Id.* 109:17-21.) According to Coleman, he wasn't aware of anything being in the car and Timothy volunteered that if the officers found anything in the rental car, it belonged to him, not Coleman. (*Id.* 109:9-11, 110:2-6.) Officers found an "ecstasy pill" and a "joint of marijuana" upon searching the car (*id.* 109:23-25), described as "DRUG METH" and "DRUG MARIJUANA" in Sperry's post-arrest incident report, both items were later identified as being "owned" by Timothy, rather than Coleman (*id.* 111:9-25;

---

contacted defendants' counsel in an attempt to reschedule the deposition but never agreed upon a mutually convenient time. (Dkt. #73.) Accordingly, the court directed plaintiff to appear for a deposition on March 19, 2024, which he did. (Dkt. #124.)

dkt. #118, at 3-4). Nevertheless, Coleman was also criminally charged with possession of methamphetamine and marijuana as party to a crime. (Dkt. #153, at 112:5-16; Dkt. #49-2.) As a result, Coleman spent seven days in jail, then several months fighting those criminal charges, although all were ultimately dropped by prosecutors nearly one year later. (Dkt. #158, at 4:3-15.)

Unsurprisingly, Sperry offered a different version of the relevant events to the jury, which included his description of the Regency Inn and Suites, where Coleman and his family had been staying, as a well-known "hotbed" of drug sales and other criminal activity in Eau Claire. (Dkt. #158, at 24:25-25:24.) When Coleman returned to the car, Sperry also testified that he observed Timothy engage in "evasive behavior." (*Id.* 29:14-24.) Further, having determined that the vehicle was a rental car, Sperry explained that rentals were in his experience often used for criminal activity. (*Id.* 33:17-25.) For all of these reasons, after the Colemans drove away from the Regency Inn's parking lot, Sperry followed them. (*Id.* 35:6-7.)

When he was approximately one hundred yards away, Sperry then testified that Coleman failed to stop at a red light before turning right. (*Id.* 35:10-17.) After following Coleman for several hundred more yards, including through several lane changes and a left turn, which Sperry also perceived as evasive action, he turned on his warning lights and initiated a traffic stop. (*Id.* 35:19-36:13, 37:6-21.) When Coleman and his brother suddenly exited their car, Sperry was concerned that they could flee or utilize a gun against him; as a result, he pulled his gun on them for safety reasons and radioed dispatch for backup, which arrived a minute or two later. (*Id.* 40:1-43:8.) After those officers also took

4

out their guns, Sperry and his colleagues then handcuffed the Colemans -- who they had

not yet identified -- and placed them in separate squad cars. (*Id*. 43:23-44:4.)

When Coleman and his brother were safely in the officers' patrol vehicles, Sperry

and some of his colleagues next walked up to the Coleman's rental car to conduct a visual

search for any other passengers, again as a safety protocol. (*Id*. 44:7-12.) Though the

officers did not locate any other occupants in the vehicle, Sperry testified he detected a

"strong odor of marijuana" coming from the car, and upon reaching the front of the car,

also observed an open container of beer on the floorboard of the car's passenger side. (*Id*.

16-21.) After receiving basic biographical information from the Colemans, Sperry then

began to search their vehicle. (*Id*. 45:24-46:9.)

During Sperry's search of the car, he located a knife in the driver-side door pocket,

a hypodermic needle under the passenger-side floor mat, a corner-cut baggie with a

substance he recognized as marijuana, and a gem baggie with two, multicolored pressed

pills, as well as four cell phones and a tablet. (*Id*. 46:10-22.) Sperry recognized the pills

as ecstasy, also known as MDMA. (*Id*. 48:15- 49:1.) Further, after conducting a field test

of the pills, using a kit called "NARK II," which can identify the presence of

methamphetamine or MDMA in the substance being tested. (*Id.* 49:6-18.) That test

yielded a presumptive positive result. (*Id.*)[4]

After the unwarranted car search, Sperry obtained a warrant to search Coleman's

hotel room, because he believed that both Coleman and Timothy were involved in the sale

---

[4] In the incident report that Sperry drafted after Coleman's arrest, he described locating evidence of 1.1 grams of MDMA belonging to both Coleman and Timothy, which had yielded a "positive presumptive test result for the presence of amphetamines." (Dkt. #118, at 11.)

or distribution of controlled substances, in his view potentially involving a "greater criminal enterprise," rather than simple possession.  (*Id.* 53:2-54:5.)  Moreover, according to Sperry -- and contrary to Coleman's testimony -- Timothy only admitted owning the "small amount of marijuana" that was in the car, rather than "all of the substances[.]"  (*Id.* 54:6-10.)  During the execution of the search warrant at Coleman's hotel room, officers found on top of a child's backpack a glass bong and metal grinder, both often used to consume THC.  (*Id.* 57:14-17.)  Nevertheless, as a result of the search, officers determined that Coleman was not involved in drug distribution.  (*Id.* 57:18-20.)  After finishing the search of Coleman's hotel room, Sperry completed an incident report detailing his encounter with the Colemans, as well as the information and evidence he obtained, which was sent to the Eau Claire County District Attorney's Office for subsequent use in determining if charges were appropriate.  (*Id.* 58:2-13.)

At the conclusion of Officer Sperry's direct examination, a juror passed along a question asking that he "re-explain field tests for amphetamines," because "[i]sn't MDMA considered an amphetamine?"  (*Id.* 66:4-9; dkt. #150-1.)  In response, Sperry explained that he was initially mistaken, and the field test was "both a test for the presence of amphetamines in MDMA, as well as [a test for] the presence of methamphetamine."  (Dkt. #158, at 87:18-88:14.)  Moreover, Sperry added that MDMA in the Eau Claire area was often cut with methamphetamine, rather than being strictly made with amphetamines.  (*Id.*)  Beyond the field test, Sperry also noted that a second test would be required to prove the presence of amphetamines in those pills (*id.* 89:6-18), and acknowledged that possession of those drugs were chargeable under different criminal statutes.  (*Id.* 88:24-

89:5.)   Finally, Sperry acknowledged that the discrepancy between his police report describing amphetamines and "every other charging document" listing methamphetamine was due to "a mistake of understanding what the test kit will show."  (*Id*. 90:19-23.)[5]

Before Sperry concluded his testimony, jurors had four, additional questions for him:  (1) whether the field test he conducted would test positive for either MDMA or methamphetamine; (2) whether amphetamines "equal[ed]" MDMA or meth; (3) whether Timothy's residence was also searched; and (4) why Sperry didn't pull Coleman over sooner after he observed Coleman running the red light.  (Dkt. #158, at 2:7 and Dkt. #150-1, at 2-4.)  Sperry responded that the field test was "just for methamphetamine"; amphetamines were an "overall umbrella" under which those drugs fell; Timothy's residence was not searched; and he "couldn't have conducted the traffic stop any sooner than [he] had."  (Dkt. #158, at 103:20-104:23.)

Sperry called one additional witness, Officer Vang, who told jurors that on the evening of October 7, 2019, he responded to a request for support from Sperry in an "urgent" and "quite serious" situation.  (*Id*. 109:12-18.)  Vang's testimony largely mirrored Sperry's description of the arrest and vehicle search with one notable exception:  he told jurors that when they searched the Colemans' vehicle, Sperry was on the passenger side of the car -- not the driver's side.  (*Id*. 129:16-130:9.)  Vang added that while he saw a Corona bottle in the vehicle on the passenger side "right away[,]" he only saw it "right when [he] opened the door" on the floorboard, rather than from outside the car.  (*Id.* 131:11-19.)

---

[5] The Wisconsin State Crime Lab only confirmed the presence of methamphetamine in the pills that Sperry recovered on June 26, 2020, albeit over eight months after Coleman was arrested and charged.  (Dkt. #135, at 1.)

After two days of testimony, the liability case was submitted to the jury. During their deliberations on liability, the jury sent the court four questions in two notes. In their first note, jurors asked if: (1) there was video of the traffic stop or body cam footage; and (2) they could have a map of the roads involved in this case. (Dkt. #150-2, at 1; dkt. #159, at 2.) After discussion with the parties, the court answered the question regarding the availability of video in the negative, while providing the jurors with a basic screenshot from Google Maps of the relevant area. In their second note, the jury asked for: (3) standard Eau Claire Police Department procedures for brandishing a firearm; and (4) confirmation that officers are equipped with non-lethal force, including OC spray or tasers. (Dkt. #150-2, at 3; dkt. #159, at 9-11.) The court also provided the jury with responses to those questions despite Sperry's objections. (Dkt. #159, at 10-11.)

After deliberating for roughly half a day, the jury found Sperry liable for stopping Coleman without reasonable suspicion that he had committed a traffic offense or crime, and for maliciously prosecuting Coleman for offenses charged after his arrest on October 7, 2019. (Dkt. #148.) However, Sperry was found not liable for use of excessive force against Coleman. (*Id.*)

The trial then proceeded to a damages phase, during which Coleman testified about the impact that the traffic stop, subsequent hotel room search, and ultimate prosecution, all had on him. In particular, he explained how his period of incarceration after the arrest led him to worry deeply about his wife and children's ability to subsist on their own, particularly given his wife's challenges in being able to take care of the children by herself. (Dkt. #160, at 17:4-18:3.) Although the court emphasized to jurors that they could only

award damages to Coleman, not to his wife or children (*id.* 18:4-10), Coleman was also allowed to explain that as a result of his arrest and subsequent eviction from the Regency Inn and Suites, he and his family were forced to live in a U-Haul storage unit and the further impact this had on him. (*Id.* 19:4-19.) He also introduced exhibits including hotel and moving receipts, academic transcripts, and tuition account statements incurred as a result of the disruption after his arrest and incarceration.

Jurors posed additional questions to Coleman during the damages phase, including: (1) when Coleman moved back to Alabama; (2) how long he resided in Eau Claire; and (3) why, specifically, Coleman felt he had to move his family from Eau Claire back to Alabama. (Dkt. #160, at 68.) Coleman testified in response to each of those questions as posed by the court. (*Id.*, at 68-70.)

Finally, during the course of their deliberations on damages, jurors sent a note asking whether the search warrant application and hotel search could be considered in calculating damages for Coleman's malicious prosecution claim. (Dkt. #150-2, at 6; dkt. #160, at 98-99.) With the agreement of the parties, the court responded in writing that "although neither was the subject of a specific claim in this case," jurors "may consider all facts to the extent they inform your finding as to the damages caused by one of defendant's violations of the Fourth Amendment, provided you do not double count injuries or damage awards." (Dkt. #160, at 99-100; dkt. #50-2, at 6.)

After approximately 90 minutes of deliberation, the jury awarded Coleman: $50,000 in compensatory damages but zero dollars in punitive damages for the illegal

9

traffic stop and $400,000 in compensatory damages and an additional $100,000 in punitive damages for the malicious prosecution.  (Dkt. #149.)

OPINION

## I.  Rule 50(b) Motions (Dkt. #161; Dkt. #174)

Under Rule 50, judgment may be granted as a matter of law where there is no "legally sufficient evidentiary basis" to uphold the jury's verdict on that issue.  Fed. R. Civ. P. 50(a).  More specifically, the court is to "examine the evidence presented, combined with any reasonably drawn inferences, and determine whether that evidence sufficiently supports the verdict when viewed in the light most favorable to the non-moving party." *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 835 (7th Cir. 2013).  In doing so, the court is not to make credibility determinations or weigh the evidence.  Rather, the court must ensure that more than "a mere scintilla of evidence" supports the verdict, *Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 859 (7th Cir. 2007), and reverse "only if no rational jury could have found for the prevailing party," *AutoZone, Inc.*, 707 F.3d at 835.

Further, "[b]ecause the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion."  *Wallace v. McGlothan*, 606 F.3d 410, 418 (7th Cir. 2010); *see also Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 407 (7th Cir. 2010) (refusing to consider the defendant's argument that plaintiff failed to demonstrate that he suffered an adverse employment action, in part, because the defendant did not raise that argument in its initial Rule 50(a) motion); Fed. R. Civ. P. 50 cmt. 1991 Amendments ("A post-trial motion for judgment

can be granted only on grounds advanced in the pre-verdict motion.").  This distinction is important because at the conclusion of the liability phase of this trial, defendants moved for a directed verdict under Rule 50(a) on plaintiff's Fourth Amendment malicious prosecution and excessive force claims (dkt. ##139, 154 at 29), which the court implicitly denied by allowing both to go to the jury.  On the other hand, plaintiff did not raise any motion under Rule 50(a) at trial, instead opting to seek judgment as a matter of law on his excessive force claim "pursuant to Fed. R. Civ. P. 50(b)(3)" in his opposition to defendant's motion.  (Dkt. #174, at 2.)  Because plaintiff never filed a pre-verdict motion for judgment as a matter of law, let alone raise a timely motion under Rule 50(b), his request for judgment as a matter of law on his excessive force claim must be denied.

In defendant's first motion for a directed verdict, he argues that:  (1) because the evidence in the record established the searches of plaintiff's vehicle and hotel room were supported by probable cause, plaintiff's malicious prosecution claim fails as a matter of law; (2) defendant was entitled to qualified immunity as to the search of plaintiff's vehicle and hotel, because he had arguable probable cause to search them based on his observations; and (3) there was no evidence to support a finding that defendant used excessive force against plaintiff.  (Dkt. #139.)  While the jury subsequently found defendant liable for maliciously prosecuting plaintiff, it also found that defendant did not use excessive force against him.  (Dkt. #148, at 1.)

Defendant's renewed motion for a directed verdict again argues that:  the record lacked any evidence or legal basis for the jury to find he maliciously prosecuted plaintiff; and in the alternative, he was entitled to qualified immunity.  (Dkt. #161.)  Defendant

also asks the court to order a new trial as to plaintiff's unreasonable traffic stop claim, even if it only enters judgment as a matter of law in defendant's favor as to plaintiff's malicious prosecution claim. (*Id.* at 33.) Because defendant failed to raise the insufficiency of plaintiff's evidence regarding the traffic stop as grounds for a directed verdict in his Rule 50(a) motion, the court need only address his arguments that the record lacks evidence to support the jury's finding that defendant maliciously prosecuted plaintiff, and that defendant is entitled to qualified immunity. *Thompson*, 625 F.3d at 407.[6] Those arguments are addressed below in turn.

### A. Sufficiency of Evidence Supporting Jury's Finding of Malicious Prosecution

Claims of malicious prosecution require proof that: the underlying prosecution was instituted without probable cause; defendant's motive in bringing the charges was malicious; and the criminal prosecution ended without a conviction. *Thompson v. Clark*, 596 U.S. 36, 42, 49 (2022). Since the district attorney dropped the prosecution altogether, the last element is certainly satisfied. Further, when analyzing a malicious prosecution claim, courts are to consider whether probable cause existed when the plaintiff was charged, not when he or she was arrested. *Holland*, 643 F.3d at 254. In the context of a malicious prosecution claim, probable cause exists where the facts alleged "would lead

---

[6] Even if the court were to consider the merits of defendant's challenge to the jury's finding that he lacked grounds to make the original traffic stop, there is ample evidence to support the jury's rejection of Officer Sperry's credibility in claiming lawful reasons for following defendant from the hotel or seeing his supposed illegal right turn from more than 100 yards away. Indeed, dash cam video only produced by the Eau Claire Police Department *after trial* confirms that Coleman made no illegal right turn, just as the jury concluded. *See* https://www.weau.com/2024/05/01/jury-rules-favor-mans-lawsuit-against-eau-claire-police-officer/ (last viewed March 12, 2026).

a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Williams v. City of Chicago*, 733 F.3d 749, 759 (7th Cir. 2013).

On the basis of defendant's observations, testimony, and written reports, plaintiff was charged with possessing methamphetamine and cannabis, both as a party to a crime, and possession of a concealed knife. (Dkt. #49-2, at 1-2.) Defendant also issued plaintiff with a traffic citation for running a red light. (Dkt. #49-3.) Since all charges were dropped by prosecutors, the only remaining question is whether the defendant instituted the underlying prosecution without probable cause and acted with malice. While the existence of probable cause as to any one of those charges defeats a malicious prosecution claim, *Martin v. Marinez*, 934 F.3d 594, 698 (7th Cir. 2019), jurors had enough evidence to conclude that defendant in fact lacked probable cause to believe plaintiff had committed *any* of those offenses.

As to the red light violation and knife possession charges, jurors were entitled to weigh the competing narratives of the parties, and decide that plaintiff's version -- where he neither ran the red light, nor possessed or was aware of any knife in the car -- was more credible. *Taylor v. Bradley*, 448 F.3d 942, 951 (7th Cir. 2006). While the drug possession charges present a somewhat closer question, jurors were instructed on the definitions of possession and possession of an illicit drug as a party to a crime in Wisconsin. (Dkt. #143, at 8-9; dkt. #154, at 44:13-47:12.) Based on plaintiff's denial that he knew anything about the drugs found in Timothy's rental car when officers stopped them and Timothy's immediately acknowledging that the drugs were his, jurors could credibly find that plaintiff

13

lacked the necessary knowing, actual physical control over those drugs, *or* an intent to exercise control over them as required to prove possession under Wisconsin law. *See* Wis. JI-Criminal 6030 (2024). Similarly, even though plaintiff could have been liable as a party to a crime by directly possessing the drugs, he also could have been held liable "by intentionally aiding and abetting the person" who possessed them or by being a member of a conspiracy to commit that crime. That broader definition notwithstanding, jurors obviously accepted the plaintiff's testimony while finding defendant's testimony and theory of the case less than credible.

Based on its questions alone, the jury plainly questioned defendant's testimony regarding: the nature of the drug involved; plaintiff's supposed possession of each being credible, much less chargeable under the different criminal statutes; field tests he conducted on the substances found in the rental car; and defendant's sometimes inconsistent answers about what those tests showed. Though the court sought to assist jurors in understanding the case by allowing defendant to answer their questions, his own conflicting testimony alone could reasonably give jurors the opportunity to doubt his credibility and credit plaintiff's account that he had no idea about the existence of any of those drugs in the car, much less any basis to conclude the drugs were in plaintiff's possession or that he was somehow a party to the crime of possession by his brother. Particularly after the jury found that defendant's original decision to follow and stop defendant lacked good faith. the court will not disturb the jury's subsequent finding that defendant acted maliciously in pursuing charges against him. Indeed, the jury was free to find defendant's conduct here was tainted from the start and his decision to press for

14

charges against plaintiff, rather than his brother alone, was more about saving face than any good faith evaluation of the available evidence. *See Holland v. City of Chicago*, 643 F.3d 248, 255 (7th Cir. 2011) (malice can be inferred where "a defendant lacks probable cause and the circumstances indicate a lack of good faith").

### B. Qualified Immunity

Finally, given the evidence undermining defendant's version of events, the court will also deny defendant's invocation of qualified immunity grounds as a matter of law. Qualified immunity shields government officials from civil damages liability *unless* the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct. *Reichle v. Howards*, 566 U.S. 658, 664 (2012); *Ewell v. Toney*, 853 F.3d 911, 919 (7th Cir. 2017). In evaluating defendant's assertion of qualified immunity here, the question for the court is whether a reasonable officer could have mistakenly believed that probable cause existed, a concept the courts refer to as "arguable probable cause." *Harris v. City of La Crosse*, No. 23-cv-62-jdp, 2024 WL 3823094, at *11, --- F. Supp. 3d ---- (W.D. Wis. 2024) (citing *Thayer v. Chiczewski*, 705 F.3d 237, 247 (7th Cir. 2012)).

While this is a "pure question of law" that must be decided by the court, rather than a jury, *Thayer*, 705 F.3d at 247, the court must accept the jury's determination that plaintiff's version of events carried the day and apply the law to those facts. *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007). When construing those facts in the light most favorable to plaintiff -- meaning defendant lacked probable cause or arguable probable cause to initiate a stop or assert *any* criminal charges against him, and did so nonetheless -

15

- an objectively reasonable officer would have known that it was constitutionally impermissible to: (1) arrest someone without probable cause, *Harney v. City of Chicago*, 702 F.3d 916, 922 (7th Cir. 2012); or (2) falsify the factual basis for a judicial probable cause determination. *Lewis v. City of Chicago*, 914 F.3d 472, 477 (7th Cir. 2019).

Similarly -- and as discussed further below -- the jury's verdict on plaintiff's unreasonable traffic stop was supported by evidence in the record, including plaintiff's own testimony. As a result, defendant is not entitled to qualified immunity on that count either.[7] Second, even if a defendant may raise his qualified immunity defense after the jury verdict, *see Thompson,* 625 F.3d at 407, the jury obviously credited plaintiff's testimony that he complied with all traffic laws and there was no arguable probable cause to stop him at all.

Since no reasonable officer could have believed it was constitutionally permissible to stop a motorist without reasonable suspicion that he had committed any traffic or other criminal offense, *Brendlin v. California*, 551 U.S. 249, 263 n.7 (2007) (collecting cases), the jury was entitled to suspect defendant's action in inventing a basis for doing so from the start. Even viewing the subsequent evidence of possession of illicit drugs in isolation, a reasonably objective officer should have realized that the evidence did not rise to arguable probable cause to charge plaintiff with possession of the drugs or knife found in a car rented by his brother, who promptly admitted ownership over them. *Huff v. Reichert*, 744 F.3d

---

[7] Further, defendant failed to raise any argument about the sufficiency of the evidence supporting plaintiff's seizure claim in his original Rule 50(a) motion. Consequently, he is arguably barred from claiming an entitlement to judgment as a matter of law at this point in his Rule 50(b) motion.

999 (7th Cir. 2014).  Similarly, stretching to charge plaintiff with possession "as a party to a crime" does not meet the smell test, much less rise to arguable probable cause.  *See id.*

## II. Rule 59 Motions (Dkt. #162; Dkt. #176)

After a jury trial, the court may also grant a new trial under Rule 59 on some or all of the issues for "any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1).  Defendant timely filed a motion seeking a new trial on the grounds that:  (1) the jury's verdict lacked any basis in the record; and (2) the court committed several errors that affected the jury's verdict.  (Dkt. #162.)  In turn, plaintiff appears to assert his own Rule 59 motion in his response to defendant's motion (dkt. #176, at 9), which although untimely under Fed. R. Civ. P. 59(b) (requiring motions for new trial to be filed no later than 28 days after entry of judgment), the court is inclined to consider given plaintiff's *pro se* status.  Accordingly, the court analyzes the arguments that defendant makes in support of his motion -- attacking the sufficiency of the evidence that the jury relied on to reach its verdict, and alleging that the court committed certain errors in admitting and adducing evidence at trial -- as well as plaintiff's response in the alternative.

### A. Sufficiency of Evidence

Under Fed. R. Civ. P. 59, a new trial "may be granted only if the jury's verdict is against the manifest weight of the evidence."  *King v. Harrington*, 447 F.3d 531, 534 (7th Cir. 2006) (citing *ABM Marking, Inc. v. Zanasi Fratelli, S.R.L.*, 353 F.3d 541, 545 (7th Cir. 2003)).  To meet this standard, defendant must demonstrate that no rational jury could

have rendered a verdict against him. *King*, 447 F.3d at 534 (citing *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 926 (7th Cir. 2004)). Here, again, the court must view the evidence in a light most favorable to plaintiff, leaving issues of credibility and weight of evidence to the jury. *King*, 447 F.3d at 534. Thus, "[t]he court must sustain the verdict where a 'reasonable basis' exists in the record to support the outcome." *Id.* (quoting *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004)).

In his Rule 59 motion, defendant throws the proverbial kitchen sink at the jury's verdict, basically arguing that *none* of its findings were supported by facts in the record. However, because the court has already determined that the jury had a sufficient factual basis on which to find defendant liable for maliciously prosecuting plaintiff in the context of defendant's Rule 50 motion, *see* discussion *supra* Section I.A, it also concludes that the jury's verdict on that count does not go against the manifest weight of the evidence. Nevertheless, the court addresses the remaining jury findings that defendant challenges -- its verdict on plaintiff's unlawful stop claim, and its awards for compensatory and punitive damages -- as well as plaintiff's cross-motion below.

### 1. Fourth Amendment Unlawful Seizure

Defendant asks the court to order a new trial on the issue of whether he initiated the October 7, 2019, traffic stop without reasonable suspicion that plaintiff had committed a moving violation. (Dkt. #163, at 4.) Although defendant maintained throughout the trial that his observation of plaintiff's failure to stop at a red light gave him reasonable suspicion to initiate a stop, plaintiff similarly insisted throughout the trial that he *did* stop at the light. Such credibility determinations and the weighing of evidence are reserved for

the jury. *Passananti v. Cook Cnty.*, 689 F.3d 655, 659 (7th Cir. 2012). Rather than point to a lack of evidence supporting plaintiff's claim, defendant's only argument appears to be that the court's liability instructions and responses to its questions somehow prejudiced the jury against him and called his credibility into question. (Dkt. #163, at 64.) For the reasons discussed below, those instructions were proper. Moreover, there *is* a reasonable, independent basis for finding that the jury's verdict was supported by the evidence in the form of plaintiff's own testimony, who the jury obviously found more credible than defendant.

In his briefing, plaintiff contends that defendant either perjured himself on the stand or misled the court as to the events and evidence in this case. (Dkt. #176, at 10.) While there was no evidence at trial to support that accusation, the court is alarmed that video of the traffic stop surfaced publicly, published by defendant's employer itself, just one week after the trial's conclusion. *EauClairePD, Eau Claire Police 19PD22024*, YOUTUBE (May 1, 2024), https://youtu.be/a8XKCApujMM. Though defendant's counsel never affirmatively represented to the court that no such footage existed (dkt. #159, 7:21-8:10) and plaintiff does not appear to have pursued the video in discovery, the court specifically flagged the absence of that video in its order on summary judgment and its inability to resolve some of, if not all of, plaintiff's factual assertions as a result. (Dkt. #72, at 7 n.2.) Nevertheless, an Eau Claire Deputy City's Attorney discussed the video and its alleged probative value with media outlets after its publication. *See* Daniel Gomez, *Jury rules in favor of man's lawsuit against Eau Claire police officer*, WEAU 13 NEWS (May 1, 2024), https://www.weau.com/2024/05/01/jury-rules-favor-mans-lawsuit-against-eau-claire-police-

officer/ ("I don't think a reasonable person can watch that video and think that the Eau Claire Police Department did anything wrong[.]").

Given that the footage necessarily existed throughout the pendency of this case, the failure of defendant's counsel to produce that video in discovery or at trial -- or at least bring its existence to the court's attention -- is deeply troubling. In any event, absent any justification for the delay in producing the video, defendant may not use it to argue for a retrial. Fed. R. Civ. P. 37(c)(1).

## 2. Compensatory Damages Award

Defendant also challenges the size of the jury's compensatory damages award to plaintiff as to both his unlawful stop claim ($50,000) and his malicious prosecution claim ($400,000), arguing that the jury lacked evidence to award either. (Dkt. #163, at 68-77.) Plaintiff testified to physical injury, pain, and emotional suffering experienced because of these Fourth Amendment violations. *See Cyrus v. Town of Mukwonago,* 624 F.3d 856, 865 (7th Cir. 2010). Nonetheless, defendant contends that the jury's awards lacked a rational relationship with the evidence adduced at trial, while failing to show why that is the case as to either award.

Citing only a single case involving an unlawful traffic stop where the district court limited plaintiff's damages to $1, *Martin*, 934 F.3d at 594, defendant argues that the jury overshot by awarding plaintiff $50,000. While the Seventh Circuit has described an unlawful traffic stop as a "de minimis deprivation of liberty" for which damages could be "too slight to support the expense of suing[,]" *Ford v. Wilson*, 90 F.3d 245, 248 (7th Cir. 1996), the jury was presented with evidence that, despite committing *no* traffic offense,

plaintiff and his brother -- both African-American -- were suddenly stopped with guns drawn, late at night, in a town about which both were largely unfamiliar, against a broader, national discussion regarding videotaped violence and even deaths of individuals in police custody.[8]  (Dkt. #160, at 32:14-22.)  Considering all of the circumstances, the court will not upset the jury's finding as to the appropriateness of the damages plaintiff experienced as a result of defendant's unlawful traffic stop.

Nor will the court disturb the jury's compensatory and punitive damage awards for malicious prosecution.  Largely because of an illegal stop and dubious charges against plaintiff (as opposed to plaintiff's brother), the evidence adduced at trial and credited by the jury showed that plaintiff spent a week in jail, suffering significant upheaval to his personal life and academic career, then was forced to rebuild his life in a different state that he had previously sought to leave, while continuing to fight criminal charges for a series of offenses that he did not commit in this state.  Under those circumstances, the jury's award of $400,000 is within the range of reasonableness.

### 3.  Punitive Damages Award

Next, defendant demands a new trial to determine whether punitive damages were warranted.  (Dkt. #163, at 77.)  Punitive damages are appropriate when a defendant acts "wantonly and willfully, or was motivated in his actions by ill will or a desire to injure. *Hendrickson v. Cooper*, 589 F.3d 887, 894 (7th Cir. 2009).  In a § 1983 case, a plaintiff must

---

[8] While plaintiff referenced the murder of George Floyd as having "just" taken place at the time he was arrested, (dkt. #160 at 42), that actually occurred nearly a year later, in the summer of 2020, there is no doubt that and other heavily reported incidents were in the plaintiff's and the jurors' minds in this case.

prove that defendant was motivated by an "evil motive or intent, or [] reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). The court must give deference to a jury's award of punitive damages "unless there was no rational connection between the evidence on damages on the verdict -- unless, in other words, the verdict was 'monstrously excessive.'" *Abernathy v. Superior Hardwoods, Inc.*, 704 F.2d 963, 971 (7th Cir. 1983). Given the necessary finding that defendant acted maliciously by arresting and charging plaintiff, a punitive damages award of $100,000 is certainly not per se unreasonable.

## B. Alleged Evidentiary Errors

The court may also grant a new trial if "the trial was unfair to the moving party." *Lust v. Sealy, Inc.*, 277 F. Supp. 2d 973, 993 (W.D. Wis. 2003) (citing *David v. Caterpillar, Inc.*, 324 F.3d 851, 863 (7th Cir. 2003)). Defendant argues that several evidentiary errors at trial warrant the grant of a new trial on plaintiff's malicious prosecution and unlawful stop claims. However, a new trial based on an error in the admission of evidence is granted only in "extraordinary situations," *Shick v. Ill. Dep't of Human Servs.*, 307 F.3d 605, 611 (7th Cir. 2002), in which the error likely affected a substantial right of a party -- meaning that there is a significant chance that the error affected the jury's verdict. *Horvath v. West Bend Mut. Ins. Co.*, 534 F. App'x. 552, 556 (7th Cir. 2013). Thus, whether there was reversible error "turns on an analysis of the evidentiary ruling in the context of the entire trial record." *Barber v. City of Chicago*, 725 F.3d 702, 705 (7th Cir. 2013). Defendant faces an uphill battle in this case, because the outcome of the trial depended upon the resolution

of relatively simple issues from highly disputed factual testimony.  *Whitehead v. Bond*, 680 F.3d 919, 925 (7th Cir. 2012).

### 1.  Judicial Notice of NARK II Test

At the heart of defendant's motion for a new trial is the court's decision -- responding to a jury question arising out of his own testimony -- to take judicial notice of the manufacturer's description of the NARK II test that defendant stated he used on the pills retrieved from the rental car.  (Dkt. #163, at 1.)  While now implying that he may have used another test that was not the NARK II -- notwithstanding his testimony at trial to using the "Narco II" test for methamphetamine and MDMA -- defendant never pointed the court to any other test that he may have used instead.  (Dkt. #163, at 49; dkt. #158, at 49:6-15).  Whether or not the court erred in judicially noticing a fact regarding a drug test that defendant himself testified to using, the court is reasonably confident that decision had limited affect on his substantial rights in the jury's evaluation of his decision to charge plaintiff with possession of what were admittedly, ultimately determined to be MDMA pills.  Indeed, the real issue was not whether illicit drugs were present in the case, which even defendant agrees plaintiff's brother admitted were his, at least with respect to the marijuana, and according to plaintiff and his brother all illicit drugs, but whether it was reasonable to find probable cause to charge plaintiff with possession "as a party to a crime" simply because he was driving his brother's rental car, especially after his brother immediately took ownership of the drugs.

Regardless, defendant himself first testified on direct examination that a positive NARK II test result would show that the substance being tested contained

"methamphetamine *or* MDMA."  (Dkt. #158, at 49:14-15 (emphasis added).)  Even in later testimony, the defendant took the position that his field test was "just for methamphetamine[,]" but that amphetamines were an "overall umbrella" under which both drugs fell.  Regardless, given the jurors' obvious confusion about what the test could show as evidenced by notes received from multiple jurors, and what defendant was actually testing for, the court does not think it was an error to take judicial notice of a fact that defendant's own, initial testimony put in question.

## 2.  Closing Liability Instructions

Defendant also objects to the court's decision to include a paraphrased summary of the NARK II test description in its closing jury instructions, arguing that it misled the jury and unfairly characterized his testimony as "confusing[,]" which further undermined his credibility.  (Dkt. #163, at 2.)  He also contends that the court erred in supplementing its written closing liability instructions by referencing the substances found in the rental vehicle, stating that "we now know" one of the substances was methamphetamine.  (*Id.* at 3.)

However, erroneous jury instructions cannot prejudice defendant unless "considering the instructions as a whole, along with all of the evidence and arguments, the jury was misinformed about the applicable law."  *Susan Wakeen Doll Co., Inc. v. Ashton Drake Galleries*, 272 F.3d 441, 452 (7th Cir. 2001).  Here, the jury instructions on possession of controlled substances and possession as a party to a crime were sourced, verbatim, from the pattern Wisconsin Jury Instructions for those crimes.  Accordingly, the court's inclusion of a judicially-noticed fact in the closing liability instructions, as well as its reference to the

24

State Crime Lab's conclusion that the pills found in the rental car were, in fact, methamphetamine -- a fact adduced in defendant's own case-in-chief -- did *not* misinform the jury as to the *law or* undisputed *facts,* much less swayed its understanding of how to apply either.

### 3.  Court Questions During Redirect Examination of Plaintiff

Finally, defendant contends that a new trial is warranted because the court asked plaintiff "leading" questions during plaintiff's rebuttal examination, which "impermissibly suggest[ed]" his testimony regarding an open container of alcohol in his vehicle, despite lacking personal knowledge of the subject matter.  (Dkt. #163, at 3, 10.)  To begin, a court may, in its discretion, permit leading questions on direct or re-direct examination of a witness.  *Arnold v. United States*, 7 F.2d 867, 869 (7th Cir. 1925).  Moreover, the court rephrased its question to plaintiff, without objection, simply to clarify for the jury what he knew about the bottle (dkt. #154, at 25-14-17), and his answer -- that it was under the passenger seat on the floor boards, and not visible from outside the vehicle -- was consistent with his original statement that he wasn't aware of any illegal substances being present in the car.  Finally, plaintiff could well have learned about the bottle's location *after* officers retrieved it, something defendant's counsel never explored with plaintiff.

## III. Motion to Stay Execution of Judgment and to Waive Supersedeas Bond (Dkt. #165)

Defendant also moves to stay execution of the judgment and waive the supersedeas bond requirement until final resolution of his appeal.  As explained in his motion, defendant was insured from 2019 through 2021 -- the years during which the events giving

rise to plaintiff's claims occurred -- by a series of Public Entity Liability insurance policies issued by the Wisconsin Municipal Mutual Insurance Company ("WMMIC"). (Kaul Decl. (dkt. #168) ¶¶ 3-4.) The limit of liability for the 2019 policy is $10 million per occurrence, with a deductible of $200,000 per occurrence, and the limit of liability for the 2020 and 2021 policies is $12 million per occurrence, also with a deductible of $200,000 per occurrence. (*Id.*) Jacqueline Kaul, director of operations at WMMIC, avers that "WMMIC has accepted coverage, without reservation of rights, for the claims asserted by [plaintiff] against [defendant]." (*Id.* at ¶ 4.) "In the event [defendant] is unsuccessful on appeal," Kaul further avers that WMMIC will provide coverage under the terms of the relevant policies to pay the judgments, including any award of attorney's fees, costs, and interest." (*Id.*)

In considering whether to waive the bond requirement under Federal Rule of Civil Procedure 62(d), the Seventh Circuit instructs that this court consider the following factors:

> (1) the complexity of the collection process; (2) the amount of time required to obtain a judgment after it is affirmed on appeal; (3) the degree of confidence that the district court has in the availability of funds to pay the judgment; (4) whether the defendant's ability to pay the judgment is so plain that the cost of a bond would be a waste of money; and (5) whether the defendant is in such a precarious financial situation that the requirement to post a bond would place other creditors of the defendant in an insecure position.

*Dillon v. City of Chi.*, 866 F.2d 902, 904-05 (7th Cir. 1998) (internal citations and quotation marks omitted). Most, if not all, of those factors weigh in favor of waiving the bond requirement: the apparent lack of dispute over the application of the insurance

policies to cover final judgments here; WMMIC's solvency; the sworn representations made by WMMIC's director of operations about coverage under these insurance policies; *and* the City of Eau Claire's ultimate liability should payment not be made timely under the policies.

Accordingly, the court will grant defendant's motion for a stay pending appeal provided within 21 days of this opinion and order:  (1) WMMIC provides a formal, written assurance of payment of the final judgment in full, including all accrued interest, attorneys' fees and costs, should no appeal be sought timely *or* within 30 days of remand of an appeal for enforcement of that judgment, whichever is later; *and* (2) the City of Eau Claire provides a written acknowledgement of its obligation to do the same within 60 days of that amount being due should WMMIC fail to perform timely on its assurance.

## IV. Motion for Appointment of Counsel (Dkt. #172)

Despite ably representing himself at trial, plaintiff again asks the court to appoint counsel to represent him in this lawsuit and this request must again be denied.  Litigants in civil cases do not have a constitutional right to counsel, and the court does not have the authority to order counsel to represent him in a civil matter.  Rather, the court can only assist in recruiting counsel who may be willing to serve voluntarily.  *See* 28 U.S.C. § 1915(e)(1); *Pruitt v. Mote*, 503 F.3d 647, 654, 656 (7th Cir. 2007) (en banc).

A party requesting *assistance* in recruiting counsel must show three things:  (1) he cannot afford to hire a lawyer, 28 U.S.C. § 1915(e)(1); (2) he made reasonable efforts on his own to find a lawyer to represent him, *Jackson v. Cnty. of McLean*, 953 F.2d 1070, 1073 (7th Cir. 1992); and (3) the legal and factual difficulty of the case exceeds his ability to

prosecute it, *Pruitt*, 503 F.3d at 655.  Since plaintiff was allowed to bring this case with a partial payment of fees, *see* 28 U.S.C. § 1915(b)(1), he met the first requirement.  (*See* dkt. #5.)  However, plaintiff has not met the other two requirements:  he has neither presented any evidence of efforts to find a lawyer to represent him, nor has he established that this is one of those cases that is too factually or legally complex for the plaintiff to litigate on his own.  Plaintiff asserted that his detention limited his access to court documents or materials with which to file briefs or motions, but these circumstances are common among the many unrepresented prisoner plaintiffs in this court, and plaintiff's timely filings several weeks later showed that he managed to obtain the resources needed to litigate this case.  Indeed, he has now prevailed both on summary judgment and at trial, as well as on nearly all of defendant's post-trial motions.  Finally, to the extent that plaintiff may require counsel to represent him on appeal, he should direct that request to the Seventh Circuit, which has a larger group of counsel to prevail upon for representation.

## V.  Motion for Prejudgment Interest (Dkt. #185)

Finally, nearly six months after the entry of final judgment in this case, plaintiff moved for an award of prejudgment interest in the amount of $200,140.97.  (Dkt. #185.)  Without identifying any specific authority authorizing reconsideration of the order entering final judgment, plaintiff contends that he is "presumptively entitled to prejudgment interest in claims arising under Federal law."  (*Id.* at 1 (citing *Rivera v. Benefit Tr. Life Ins. Co.*, 921 F.2d 692, 696 (7th Cir. 1991)).)  In fairness, a party may make that request in a post-trial motion, even if he fails to plead it in his complaint.  *Brooms v. Regal Tube Co.*, 881 F.2d 412, 424 n.9 (7th Cir. 1989); Fed. R. Civ. P. 54(c) (final judgments

"shall grant the relief to which a party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings").  There are essentially two ways for plaintiff to do so after the entry of final judgment:  (1) a motion to alter or amend the judgment pursuant to Rule 59; or (2) a motion for relief from the judgment pursuant to Rule 60.  Because Rule 59 requires that a motion to alter or amend a judgment be filed no later than 28 days after the entry of judgment, Fed. R. Civ. P. 59(e), the court would have to construe his motion as one for relief from the judgment under Rule 60, which gives litigants far longer periods -- in some cases, an indefinite amount of time -- in which to file. Fed. R. Civ. P. 60(c)(1).

Nevertheless, the decision to award prejudgment interest is a matter within the district court's discretion, *Pickett v. Sheridan Health Ctr.*, 813 F.3d 640, 646 (7th Cir. 2016), and there are important limits on such awards.  In particular, the Seventh Circuit has cautioned against an award when the jury's damages award takes into consideration the time value of money.  This concern is most clearly illustrated in cases where the jury awards an amount for lost wages, combining both losses for past and future wages.  *Williamson v. Handy Button Mach. Co.*, 817 F.2d 1290, 1298 (1987).  As the court explained in *Williamson*, "[o]nly back pay and expenses in the past may be augmented by prejudgment interest." *Id*.  Similarly, an award of prejudgment interest is also not appropriate if the jury's award included interest.  *See Raybestos Prods. Co. v. Younger*, 54 F.3d 1234, 1246-47 (7th Cir. 1995) (presuming that the jury's award included an interest augmentation).

Although plaintiff presented some evidence of specific moving and tuition expenses that he incurred after his arrest, the jury was only instructed to consider the "pain and

29

suffering that [plaintiff] has experienced, as well as any mental or emotional injury resulting from that physical pain and suffering" in awarding compensatory damages. (Damages Instr. (dkt. #145) 1.)  In his closing argument on damages, plaintiff similarly explained that the evidence of expenses that he introduced was intended to explain "what me and my family went through and continuously go through[.]"  (Trial Tr. (dkt. #160) 76.)

Given that the jury presumptively awarded plaintiff compensatory damages based on injuries presented at trial in 2024, the money value of those damages awarded presumably was as of the time of the verdict, not at the time of injury.  Therefore, the court finds no basis to enter a prejudgment interest award to account for any time lapse between the injury and that verdict, especially since neither side asked for any clarifying language in the jury instructions on damages.


ORDER

IT IS ORDERED that:

1) Defendant Sam Sperry's renewed motion for directed verdict and entry of judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) (dkt. #161) and motion for a new trial pursuant to Fed. R. Civ. P. 59 (dkt. #162) are DENIED.

2) Defendant's motion to stay execution of judgment and waive the supersedeas bond requirement (dkt. #166) is GRANTED IN PART AND DENIED IN PART.  The stay is GRANTED for 60 days to provide defendant with time to file the two submissions from WMMIC and the City of Eau Claire as described above.  If defendant provides those submissions, the stay is extended until resolution of any appeal.  If defendant fails to provide those submissions, the stay will be lifted after the 60-day period.

3) Plaintiff Sidney Coleman's motions for appointment of counsel (dkt. #172), judgment as a matter of law pursuant to Fed. R. Civ. P. 50 (dkt. #174), new trial (dkt. #176), and prejudgment interest (dkt. #185) are DENIED.

Entered this 12th day of March, 2026.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge